### In re SHELL OIL REFINERY.

### Civ. A. No. 88–1935.

United States District Court,
E.D. Louisiana.

Oct. 20, 1993.

---

Daniel E. Becnel, Becnel, Landry & Becnel, Reserve, LA, Joseph M. Bruno, Bruno & Bruno, New Orleans, LA, Liaison Counsel, John J. Cummings, III, Cummings, Cummings & Dudenhefer, New Orleans, LA, Deonne DuBarry, Metairie, LA, Calvin C. Fayard, Jr., Fayard, Harris & Honeycutt, Denham Springs, LA, Wendell H. Gauthier, Gauthier & Murphy, Metairie, LA, Thomas Kliebert, Jr., Kliebert & Heltz, Gramercy, LA, Stephen B. Murray, Murray Law Firm, Morris Reed, New Orleans, LA, W. Hugh Sibley, Sibley & McShan, Greensburg, LA, for plaintiffs.

Thomas J. Wyllie, Scott E. Delacroix, Adams and Reese Law Firm, New Orleans, LA, for defendant, Shell Oil Co.

James F. Holmes, Christovich & Kearney, New Orleans, LA, for defendant, Brown & Root.

MEMORANDUM OPINION

MENTZ, District Judge.

This class action litigation is before the court for final approval of the proposed settlement between the class of plaintiffs certified in these proceedings, represented by the Plaintiffs' Legal Committee as court-appointed counsel (PLC), and the defendants, Shell Oil Company (Shell), and Brown & Root, Inc. U.S.A. (Brown & Root). Also, before the court is the PLC's Petition for Award of Fees and Costs.

A Preliminary Settlement Agreement (PSA) was executed by the PLC, the class representatives, and the defendants on June 9, 1993, and was preliminarily approved by the court on that date. Following notification of settlement to the claimants, a fairness hearing began on September 21, 1993, and concluded on October 19, 1993. Considering the evidence admitted at the hearing, the Report of the Special Master, Nita Gorrell, and drawing upon the court's knowledge of this case based upon extensive involvement over five and one-half years of litigation, the court concludes that the proposed settlement in the amount of $170,000,000, plus interest is fair, reasonable, and adequate. The court further finds that the PLC is entitled to attorneys fees in the amount of $31,846,-795.76 and costs in the amount of $13,845,-192.57.

## TABLE OF CONTENTS

I. BACKGROUND
II. ANALYSIS OF THE CLASS ACTION SETTLEMENT
    A. Preliminary Approval by the Court
    B. Notice of Settlement to the Class
    C. Fairness, Adequacy, and Reasonableness
        1. Existence of fraud or collusion
        2. Complexity, expense, and likely duration of the litigation
        3. Stage of the proceedings and the amount of discovery completed
        4. Probability of plaintiffs' success on the merits
        5. Range of possible recovery
        6. Opinions of class counsel, class representatives, and absent class members
            a. Exclusion objections
            b. Objections to individual allocations, fees and costs, and placement of minors' funds in trust
            c. Conclusion
    D. Conclusion
III. FEES AND COSTS
    A. Attorneys' Fees
        1. Calculation of the lodestar
        2. Adjustments of the lodestar
            a. Time and labor required
            b. Novelty and difficulty of the questions involved
            c. Skill required to perform the legal service properly
            d. Preclusion of other employment due to participation in the case
            e. The customary fee
            f. Whether the fee is fixed or contingent
            g. The time limitations imposed by the client or the circumstances
            h. The amount involved and the results obtained
            i. The experience, reputation, and ability of the attorneys
            j. The "undesirability" of the case
            k. The nature and length of the professional relationship with the client
            l. Awards in similar cases
        3. Conclusion
    B. Costs
IV. CONCLUSION

---

## I. BACKGROUND

This litigation arises out of a catastrophic explosion which occurred in the catalytic cracking unit at Shell's refinery in Norco, Louisiana on May 5, 1988. Following the explosion, many lawsuits were filed in or

removed to this court, and consolidated. The court certified a class action on November 23, 1988 under Federal Rule of Civil Procedure 23(b)(3) and designated class representatives. The class is defined as all persons or entities who were physically present or owned property within the Parishes of St. Charles, St. John the Baptist, St. James, Orleans, or Jefferson Parish on the date of the explosion and who sustained injuries or damages as a result of the explosion. The defendants are Shell, the owner of the refinery, and Brown & Root, a contractor at the refinery.

The court established two sub-classes. Subclass A applies to all class members and includes the common issues of the defendants' liability for compensatory and punitive damages. The compensatory damages alleged are remarkably varied, and include several deaths, a myriad of physical and mental injuries, property damages and diminution in value, business losses, and lost wages. The punitive damage claim is based on Louisiana Civil Code Article 2315.3 which provides a remedy for punitive damages where "the plaintiff's injuries were caused by the defendants' wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous substances or toxic substances." La.Civ.Code Ann. art. 2315.3 (West Supp.1993). Subclass B, which applies exclusively to the Shell employees working at the time of the explosion, has the common issue of Shell's liability for intentional tort, the one exception provided under the Louisiana Worker's Compensation Law[1] to the general rule that an employee's exclusive remedy is worker's compensation.

The notice of class action, opt-out period, Notice of Claim and Proof of Claim stages are described in detail in this court's opinion, *In re Shell Oil Refinery*, 136 F.R.D. 588 (E.D.La.1991), *aff'd sub nom, Watson v.* *Shell Oil Co.*, 979 F.2d 1014 (5th Cir.1992), *reh'g granted en banc*, 990 F.2d 805 (5th Cir.1993), *reh'g stayed*, 91–3449 (5th Cir. June 10, 1993), and will not be recounted here.

## II.  ANALYSIS OF CLASS ACTION SETTLEMENT

■ Pursuant to Federal Rule of Civil Procedure 23(e), a class action settlement must be approved by the court before the case may be dismissed or compromised. There are three steps that must precede a class action settlement. First, the court must preliminarily approve the settlement. Then, the members of the class must be given notice of the proposed settlement, and finally, after a hearing, the court must determine whether the proposed settlement is fair, reasonable, and adequate. *Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir.1983).

### A.  Preliminary Approval by the Court

■ In deciding whether there is good cause to issue notice to the class and to proceed with a fairness hearing, the court must determine that "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible [judicial] approval." *Manual for Complex Litigation, Second* § 30.44 (1985). *See e.g.*, Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*, §§ 11.24–11.25 (3rd ed. 1992); *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir.1981).

On March 7, 1993, after at least two years of ongoing negotiations, Shell and the PLC reached an agreement in principle for the amount of $160,000,000.[2] This offer was made contingent on the settlement of the

---

**1.** La.Rev.Stat.Ann. § 23:1032 (West 1985 & Supp.1993).

**2.** Special Master, Nita Gorrell, began conducting settlement conferences which focused on the settlement of individual claims on April 8, 1991 and continued through November 25, 1991. During that time 145 claimants were scheduled for conferences. From November 25, 1991 to May 10, 1993, the Special Master held 73 settlement conferences focusing on *in globo* settlement of the class. In addition to conferences with the Special Master, the parties conducted ongoing settlement negotiations among themselves. The settlement negotiations are discussed in greater detail in the Report of the Special Master (Rec.Doc. # 4055(g)), and in subsequent sections of this opinion.

federal opt-out suits and dismissal of the duplicative state court class actions, as well as the establishment of indemnity reserves to protect Shell against further claims. Settlement of all claims was a crucial goal, so negotiations with Brown & Root continued for several weeks. On April 29, 1993, Brown & Root agreed in principle to join in the settlement for $10,000,000.

Confection of the preliminary settlement agreement between Shell, Brown & Root, and the class required an additional three months of extensive negotiations. The negotiations required the services of accountants, tax specialists, and banking specialists, in addition to significant contributions of time on the part of counsel and their respective staffs.[3]

On June 9, 1993, when all these negotiations were completed, the parties presented to the court a lengthy and complex Preliminary Settlement Agreement (PSA), executed by the PLC, the class representatives, Shell, and Brown & Root. The exhibits attached to and part of the PSA include a comprehensive Settlement Plan, a Bank Agreement for the deposit of the Settlement Corpus, and a list of non-class claims to be settled and dismissed as a condition of settlement.

According to the PSA, the Settlement Corpus consists of two funds: the Claimants' Fund and the Supplemental Fund reserves, including interest accrued. The Claimant's Fund is the *minimum* aggregate amount available for the proposed allocations to the individual claimants; the Supplemental Fund reserves are the *maximum* amounts or "caps" set aside for fees and costs, settlement of the federal opt-out suits and dismissal of state court suits, indemnification, liability, and distribution costs and taxes. The settlement agreement did not recommend or set the amount of the Claimants' Fund or the Supplemental Reserves, with the exception that as a condition of settlement the defen-

dants required an indemnity fund in the amount of $1,050,000 to be held for thirteen months after entry of Satisfaction of Judgment.

The settlement agreement was accompanied by the affidavits of the PLC, Shell, and Brown & Root, and a report and declaration of the Special Master, each of which set forth the essential reasons for the settlement and their conviction that the settlement amount was well within the range of possible approval and was the result of arms length, non-collusive bargaining. At this time, after more than five years of litigation, the court and the parties were in a superior position to assess the strengths and weaknesses of their respective positions in light of the facts developed and the applicable law.

Considering this evidence, together with the court's distinct perception of the good faith efforts of counsel to represent zealously the interests of their clients during settlement negotiations, the court found that the agreement was within the range of possible judicial approval. On June 10, 1993, the court entered an order of preliminary approval of the settlement agreement contingent upon subsequent determination by the court of the amount of the Supplemental Fund reserves, which would indicate whether there was an adequate amount available in the Claimants' Fund for individual allocations. Until the maximum amount of the Supplemental Fund reserves was established, the amount of the Claimant's Fund was indefinite and the PLC could not arrive at any specific proposals for individual allocations to the claimants.

Under the terms of the PSA, Shell deposited $160,000,000 and Brown & Root deposited $10,000,000 in First National Bank of Commerce, New Orleans, Louisiana, to be held in a Qualified Settlement Fund pending further orders of the court. These funds totalling

---

3. An example of an issue which required the special attention of counsel was the question of the settlement of the claims of minors, interdicts, successions, and other incapacitated class members. Resolution of the question required the parties to lobby for legislation to amend Louisiana procedure to permit the court having jurisdiction of a class action authority to approve the

settlements of these claims without prior qualifications or approval by probate or other courts. *See* Louisiana Legislature, Act 39 of 1993, amending La.Civ.Code of Proc. art. 594.

Other demanding issues included settlement of the federal opt-out suits, dismissal of duplicative state court suits, indemnity, and assignment of claims.

$170,000,000, plus the interest accruing thereon, constitute the Settlement Corpus.[4]

On July 27, 1993, the court granted the PLC's motion to fix the maximum amounts for each of the Supplemental Fund reserves as follows:

1. A maximum of $1,500,000 for settlement of non-class claims. These are the lawsuits listed in Exhibit C–1 attached to the PSA which must be settled as one of the conditions for settlement of the class action.[5]

2. A maximum of $1,575,000 as an indemnity reserve in favor of the defendants as provided in the PSA. As a condition of settlement, this reserve must remain available for a period of 13 months from entry of a Satisfaction of Judgment. The purpose of the indemnity reserve is to protect and indemnify the defendants in the event additional claims might be made against them by or on behalf of any class member whose claim has been settled in the class action.

3. A maximum of $1,500,000 as a liability fund to protect members of the PLC as provided in the PSA. This liability fund must remain available for a period of thirteen months from entry of Satisfaction of Judgment. The purpose of the liability reserve is the same as the indemnity reserve in favor of the defendants.

4. A maximum of $7,500,000 for class administrative costs and expenses. These are class-wide costs and expenses which were incurred by the PLC in the representation of the class as a whole, including personnel, offices, equipment, telephones and transmission services, supplies, office expenses, postage, copies, and legal notices.

5. A maximum reserve for PLC litigation costs equal to 5% of the gross allocations to each class member, to be deducted from the Claimants' Fund. This reserve is for costs incurred by the PLC which are chargeable to class members in the usual course of litigation, exclusive of administrative and distribution costs. This includes court costs, depositions, travel, expert witness fees, photographs, and personnel time devoted to activities in the usual course of litigation.[6]

6. A maximum reserve of $244,341, plus all interest which accrues on the Settlement Corpus,[7] for distribution costs and taxes. This reserve applies to all costs that will be incurred by CADA in the management and distribution of the Claimants' Fund after a judgment on the fairness hearing becomes final and distribution is ordered by the court. These costs include setting up offices, procedures and personnel to assist with disbursement, arranging banking depositories for funds allocated to minors and incapacitated class members, issuance of settlement allocations, identification and security, equipment and supplies.

7. A maximum reserve for PLC attorney fees equal to a combination of (a) 33⅓% of the reserves for class administrative costs and expenses, distribution costs and expenses, indemnity, liability, (b) 10% of the reserve for settlement of non-class claims, (c) 33⅓% of the gross allocations to claimants who were not represented by private counsel as of June 9, 1993, when the PSA was approved, and (d) 10% of the gross allocations to claimants who were represented by private counsel as of June 9, 1993, when the PSA was approved.[8]

8. A maximum reserve for allocation adjustments equal to 5% of the Claimants' Fund. These reserves are for adjustments to individual allocations proposed by the

---

4. The Settlement Corpus will be administered by the accounting firm of Bourgeois, Bennett, Thokey & Hickey, LLP, CPAs, New Orleans, Louisiana, appointed by the court as its Court Appointed Disbursing Agent (CADA) to administer these funds in accordance with the court's orders.

5. As of October 14, 1993, the PLC had used $819,191.28 to settle these suits.

6. As of October 14, 1993, this reserve totalled $7,884,137.73.

7. The accrued interest has been calculated through December 15, 1993, in the amount of $2,683,760.05.

8. As of October 14, 1993 this reserve was $31,397,462.37.

PLC as a result of the pre-trial conferences.[9]

After setting these reserves, approximately $121,336,268 or 71.37% of the Settlement Fund, exclusive of interest to be accrued, remained available for distribution to the claimants. All reserves were subject to final awards that might be approved by the Court at the fairness hearing. Any amounts remaining in the reserves are to be disbursed for the benefit of the class in accordance with further orders of the court.

### B. Notice of Settlement to the Class

■ Rule 23(e) of the Federal Rules of Civil Procedure requires prior notice of a class settlement to all members of the class. The notice must provide the class members with sufficient information to consider the terms of the settlement and decide whether there is a basis for challenging the settlement. *Newberg on Class Actions*, § 11.30; *see Mayfield v. Barr*, 985 F.2d 1090, 1092 (D.C.Cir.1993).

■ In accordance with this purpose, the notice of the class action settlement in this case was developed by the court and the parties to inform the claimants of the terms of the proposed settlement, the date and location for the fairness hearing, and the procedure for objecting to any terms of the settlement, the exclusion of a claim, the adequacy of the amount of a claimant's individual allocation, or the PLC's petition for attorneys' fees and costs.[10] The notice provided that objections had to be filed in writing and the claimant had to be present at the commencement of the fairness hearing on September 21, 1993, for roll call. Claimants were further informed in the notice that objections to the exclusion of claims on the

basis of a release would be heard before Special Master Nita Gorrell and objections to exclusion of claims on the basis of Notice and Proof of Claim problems would be heard by Magistrate Judge Michaelle P. Wynne, with a right to appeal to the district court. Claimants objecting to individual allocations were directed to attend pre-hearing conferences monitored by the Special Master for the purpose of affording the parties and the objector the opportunity to review the nature of the objection and the reasons for it, and to possibly resolve the objections in advance of the fairness hearing. The claimants were advised that if an objection to the allocation could not be resolved at the pre-hearing conference, the objector had the right to present the objection to the court at the fairness hearing.

Through the Notice and Proof of Claim process, the PLC identified 18,157 known claimants. On July 27, 1993, the court ordered dissemination of the notice of proposed class settlement to these people. The PLC mailed the notice by first-class mail to the most current known address of all unrepresented claimants on July 30, 1993. For the claimants who are represented by individual counsel, the PLC issued the notices on July 29 and 30, 1993, to the most current known address of counsel by first class mail, handdelivery, or Federal Express. In addition, on August 11, 1993, the court approved a form of notice for publication. The specifications for publication required that the notice be printed on at least one occasion in the official journals and twice in one other newspaper of general circulation covering the fiveparishes comprising the geographical boundaries of the class, and posted by the Clerk of Court at the district courthouses in each of

---

**9.** As of July 27, 1993, the amount in this reserve was $7,401,867.32. As of October 14, 1993, the amount remaining in this reserve was $1,839,-210.31.

In the event that the total amount of the allocations exceeded the Claimant's Fund, and the overage could not be accommodated by any amounts remaining and available in other reserves, the PSA required the PLC to restructure the schedules of allocations and issue another notice to the class to permit further fairness hearings on the restructured settlement allocations.

**10.** Claimants who either failed to timely file or properly complete a Notice or Proof of Claim form, signed a release of claims, or were conceived but "unborn" on the date of the explosion, were served individual notices advising them that their claims were excluded and that their individual allocations would be zero. The notice to all other claimants included individual statements of allocation showing the proposed gross allocation and net allocation after deduction of attorneys' fees, costs, and any prior payments or liens.

the five parishes. Exhibits and testimony adduced at the fairness hearing verify that the notice was published as ordered.[11]

The notice and procedures for publication provided the claimants a full and fair opportunity to consider the proposed settlement and to have any objections heard. Accordingly, the court finds that the notice fully complied with due process and Federal Rule of Civil Procedure 23.

### C. Fairness, Adequacy, and Reasonableness

In order to determine the fairness, adequacy, and reasonableness of the settlement, the court conducted a fairness hearing lasting twelve days interspersed from September 21 through October 19, 1993.

The general rule applicable to the court's exercise of its discretion in deciding the fairness of a proposed class action settlement is that the court must "ensure that the settlement is in the interest of the class, does not unfairly impinge on the rights and interests of dissenters, and does not merely mantle oppression." *Reed v. General Motors Corp.,* 703 F.2d 170, 172 (5th Cir.1983) (quoting *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1214 (5th Cir.1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979)).

According to Fifth Circuit authority, there are six key points a court should consider in assessing the fairness of a settlement:

> (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members.

*See id.* (citing *Parker v. Anderson,* 667 F.2d 1204, 1209 (5th Cir.1982) and *Corrugated Container Antitrust Litig.,* 643 F.2d at 217). The court now examines each of these in detail.

#### (1) *Existence of fraud or collusion*

■ The court closely monitored the parties' negotiations, and has not detected any indication that the settlement agreement was the product of fraud or collusion. Indeed, after closely supervising these proceedings for over five years, the court holds the opinion that all counsel have tenaciously and vigorously represented their respective clients' interests throughout this litigation, including the negotiation process. There was no evidence offered at the fairness hearing even to suggest any fraud or collusion behind this settlement. The court admitted without opposition the affidavits of the PLC, Shell, and Brown & Root, which verify that their negotiations were in good faith and without collusion. The affidavits, testimony, and detailed Report of the Special Master, who actively participated in all aspects of settlement, confirm that the settlement was not the product of fraud or collusion.

#### (2) *Complexity, expense, and likely duration of the litigation*

There is no dispute that this case is one of the most procedurally complex, expensive, and potentially lengthy cases in this district. There certainly is no case in this district that can equal the voluminous record of this one, which at the time of this opinion consists of a 334–page docket sheet containing 4,072 entries in 334 volumes. Plaintiffs' counsel have submitted documentation showing over 240,000 hours of attorney and staff time and over 13 million dollars in expenses. The motion practice has been the most massive and persistent this court has ever encountered. To

---

11. According to the affidavits of publication, the notice was published as follows:

a) on August 18, 1993, in L'Observateur, a twice weekly newspaper of general circulation in St. John the Baptist Parish and the Official Journal of the St. John Parish Council;

b) on August 18 and 19, 1993, in the Enterprise and News–Examiner, in Vacherie, Louisiana and Lutcher, Louisiana respectively;

c) on August 19, 1993, in the St. Charles Herald–Guide, a twice-weekly newspaper of general circulation in the Parish of St. Charles;

d) on August 19, 1993, in the Times–Picayune Official Journal, Jefferson Parish, Louisiana;

e) on August 19 and 20, 1993, in The Times–Picayune, a daily paper of general circulation covering the five-parish area.

date there have been over 187 hearings and countless conferences.

Trial was estimated to require anywhere from six months to twenty years depending on whether the Fifth Circuit ultimately approved the district court's innovative four-phase trial plan.[12] *See In re Shell Oil Refinery Litigation,* 136 F.R.D. 588 (E.D.La.1991), *aff'd sub nom, Watson v. Shell Oil Co.,* 979 F.2d 1014 (5th Cir.1992), *reh'g en banc granted,* 990 F.2d 805 (5th Cir.1993), *reh'g stayed pending settlement negotiations,* No. 91–3449 (5th Cir. June 10, 1993). The trial plan was the first for a mass tort class action which did not rely on the extrapolation of compensatory damages, a method previously determined by the Fifth Circuit to violate due process. *See In re Fibreboard,* 893 F.2d 706 (5th Cir.1990). Instead, the court's plan was first to try punitive liability. If liability was found, then the same jury would proceed to determine an amount of punitive damages per dollar of compensatory damages *prior* to the determination of each class members' compensatory damages. The crux of the plan hinged on the jury being able to determine the punitive damage ratio after hearing the compensatory damages of a representative sampling of claimants, and the fact that punitive damages would not be awarded until the final phase of trial by which time each plaintiff would have been required to prove his or her own compensatory damages. For a detailed explanation of the plan, *see In re Shell Oil Refinery,* 136 F.R.D. 588 (E.D.La. 1991).

Exactly when the case would end is subject to debate. Although liability discovery was completed at the time the parties reached a settlement, and the case was ready for trial, a trial date could not be set with any certainty because the Fifth Circuit had entered a stay of the trial which remains in effect to date pending reconsideration of the opinion approving this court's trial plan. *See In re Shell Oil Refinery,* No. 91–3449 (5th Cir. May 24, 1991) (staying trial of all phases, discovery associated with phases II, III, and IV (but not phase I), pending resolution of appeal); *Watson v. Shell Oil Co.,* No. 91–

3449 (5th Cir. July 2, 1991) (excluding settlement negotiations and proof of claim process from stay order); *Watson v. Shell Oil Co.,* 979 F.2d 1014 (5th Cir.1992) (approving district court's trial plan); and *In re Shell Oil Refinery,* 990 F.2d 805 (5th Cir. April 28, 1993) (granting rehearing *en banc* ).

Under the court's trial plan, trial was estimated to require six months to five years, depending on whether the verdicts reached at each phase of trial could prompt a settlement. By any standards, even a six month trial is considered extremely lengthy and the expense for the parties, the claimants, and the judicial system would be enormous. Considering this fact and the size of the present settlement offer, there is no reason to believe that the claimants' recovery would be substantially greater, even if they obtained a settlement after the first phase of trial.

If the Fifth Circuit rejected the trial plan, the court and the parties were faced with the unpalatable and unfeasible prospect of trying over 18,000 individual compensatory damage claims *before* addressing the issue of punitive damages. In the absence of a settlement, it is clear that counsel would have relentlessly pursued this battle to the end. The enormous expense of such a task could not be predicted with any certainty, but considering the costs and fees incurred to date, it would no doubt consume the amount offered in settlement by the defendants.

As aptly stated by one court:

[t]he Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, '[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush.'

*Oppenlander v. Standard Oil Co.,* 64 F.R.D. 597, 624 (D.Colo.1974) (quoting *State of West Virginia v. Chas. Pfizer & Co.,* 314 F.Supp. 710, 743 (S.D.N.Y.1970)).

---

12. The Fifth Circuit accepted this court's certification of an interlocutory appeal under 28 U.S.C. § 1292(b) on the orders certifying the class action and establishing the four-phase trial plan.

**(3)** *Stage of the proceedings and the amount of discovery completed*

By 1991, fact discovery and the Proof of Claim process were well underway, and the June 5, 1989, deadline for claimants to file Notice of Claim forms had passed, so that the parties had a good understanding of the identity and size of the class, the types of injuries experienced by the class members, and the evidence in support of the prosecution and the defense on the liability issues.

In addition, the court's unprecedented plan for trying the punitive damage claims before all compensatory claims, issued on March 20, 1991, prompted meaningful movement toward settlement. In anticipation of this, in early 1991 the court enlisted the services of Special Master Nita Gorrell, to assist in settlement. Despite the Fifth Circuit's granting of a stay of the trial on May 24, 1991, the court's movement of the case to an early trial date inspired settlement discussions.

From April 8, 1991, to November 25, 1991, the Special Master presided over 145 individual settlement conferences,[13] in which the negotiations were limited to a case-by-case evaluation of the claimants' Proof of Claim form, medical records, and out-of-pocket expenses. This process was an informative first step in the settlement process which helped to educate the parties about the range of claims, but was inadequate to establish a pattern of damages or the settlement value of the case as a whole. *See* Report of Special Master, pages 9–13 (Rec.Doc. #4055 (g)).

Pursuant to court order, the Special Master conducted settlement negotiations directed toward universal settlement from November 25, 1991 up until the parties reached a settlement in principle on March 7, 1993.[14] The record indicates that at least by January, 1992, the parties initiated universal settlement negotiations among themselves, of which the Special Master was apprised

through requested confidential correspondence from counsel.

In March, 1992, the parties argued the appeal on class certification and the trial plan before the Fifth Circuit. Shortly thereafter, in July, 1992, while the appeal was pending before the Fifth Circuit, a conference was held before the Special Master at which the parties outlined several key requisites to settlement, including the necessity of reaching mutual agreement upon (1) a lump-sum cash settlement which would fairly and adequately compensate the class as well as fund the settlement of federal opt-out suits, and a defense indemnification fund; (2) the procedure for the fairness hearing; and (3) the method for obtaining approval of the settlement on behalf of minors, successions, interdicts, and other incapacitated class members[15]. Settlement negotiations intensified when the Fifth Circuit affirmed the district court's trial plan on December 7, 1992, and again when the Fifth Circuit granted rehearing *en banc* on April 28, 1993.

During the litigation, the court entered hundreds of orders, but there are several which the court believes directly influenced the course of the settlement negotiations. These included the court's trial plan, rendered March 20, 1991, and shortly thereafter, two orders dismissing on summary judgement the claims of strict liability and punitive damages against Brown & Root[16], leaving negligence the only claim against Brown & Root.

In addition, on March 17, 1992, the court ordered counsel to exchange all materials of any type "reviewed, examined, consulted, or generated" by a testifying expert in connection with forming his opinion, "regardless of whether he based his opinion on the material." That ruling led to a series of motions, and ultimately, the court striking Shell's experts intended to testify on the results ob-

---

**13.** The claims to be negotiated were selected by the parties on an alternating basis from each of the five affected parishes, and included those with minor claims as well as those with claims that were thought to be more serious. Although this was an elementary method of "sampling" it provided a reasonable representation of the diversity of damages asserted in the class.

**14.** During this period, the Special Master conducted approximately 73 conferences over the course of 234 hours.

**15.** It was estimated that approximately one-third of the class fit into these categories.

**16.** On June 6, 1991, and July 31, 1991.

tained from tests performed over a six-month period on a six million dollar model of a portion of the catalytic cracking unit,[17] which had been dismantled by Shell without benefit of view by the PLC.

At the time the parties reached a settlement in principle on March 7, 1993, the litigation was approaching its fifth year. Discovery was completed and the case was ready for trial. A staggering amount of discovery was conducted in this case during the last five years. Over 640 depositions were taken and over two million pages of documents were produced and reviewed. The PLC had ready access to over 10,000 of those documents, considered to be the most important, through computer optic scanning. Over 40 experts had been consulted, and the parties had exchanged all of their expert materials.

The court assumed responsibility for hearing all discovery disputes in the first instance, without requiring the parties first to bring their disputes to the Magistrate. This procedure helped to educate the court about the technical facts involved in the liability aspects of the case, and saved a tremendous amount of time in delays that occurred when the parties invariably appealed the Magistrate's ruling in the hopes of obtaining "two bites at the apple." As a result, the court has an enhanced position to assess the fairness of the settlement in light of the discovery.

Several dispositive and other important motions were pending at the time of settlement, and the court was in possession of sufficient evidence to decide the substantive merits of those motions.[18] Also, a 274–page, preliminary pre-trial order listing over 10,000 exhibits had been signed and filed. In addition, the parties had independently analyzed in depth each Proof of Claim forms submitted by over 18,000 claimants.[19]

Consequently, the parties were in an excellent position to assess their respective positions, and the court has more than an adequate basis to judge whether the settlement is fair and reasonable.

Regarding the cross-motions to disqualify, the Special Master and counsel for the PLC have testified without opposition that the pendency of these motions was not discussed during settlement negotiations. As stated above, there is no evidence that the settlement was the product of collusion or fraud. A settlement will moot the cross-motions to disqualify; however, Local Rule 20.10E, sub-Rule III, B(1) requires the judge to refer such allegations to the court *en banc* for a determination of the majority of the judges of the action to be taken. This court advised the parties of the Rule's mandate prior to preliminary approval of the settlement. Thus, the settlement will not protect the attorneys from having to respond to the ethical charges raised in the cross-motions to disqualify if the court *en banc* determines that a disciplinary action should be instituted. The court concludes that the parties conducted the settlement negotiations despite these allegations, rather than because of them.

---

**17.** Known as the Engineering Flow Test Unit (EFTU).

**18.** The pending dispositive motions were:

(1) the PLC's Motion for Partial Summary Judgment establishing the hazardous nature of the product involved in the explosion pursuant to La.Civ.Code art. 2315.3;
(2) Shell's Motion for Partial Summary Judgment on punitive liability based on a lack of evidence to establish the status and the hazardous product requirements of La.Civ.Code art. 2315.3;
(3) Shell's Motion for Partial Summary Judgment to dismiss the punitive damage claims for lack of evidence to establish the requisite level of conduct;
(4) Shell's Motion for Summary Judgment to dismiss the punitive damage claims based on the unconstitutionality of La.Civ.Code article 2315.3;
(5) Shell's Motion for Summary Judgment to dismiss all claims relative to potential ignition sources; and
(6) Shell's Motion for Summary Judgment on Intentional Tort Claims of Subclass B.

In addition, there were pending a motion for reconsideration of the order striking Shell's experts on the EFTU and cross-motions to disqualify attorneys based on allegations of unethical conduct in connection with discovery. All of these motions were continued without date pending consummation of settlement.

**19.** The Proof of Claim form was the method used for each class member to assert the various items of damages alleged to have been caused by the explosion. The 81–page form contained nine schedules for different types of damages, and was required to be completed before a notary public. As the forms were completed, the PLC compiled the information on a specially designed computer program to establish a global settlement demand. This is discussed in greater detail in a subsequent section of the opinion.

(4) *Probability of plaintiffs' success on the merits*

Shell's limited admission of strict liability [20] on April 3, 1991, was headway for the claimants but, significantly, Shell did not admit causation, or liability for intentional tort, toxic tort, punitive damages, or attorneys' fees and costs. It was clear to everyone involved that Shell intended to contest fully and tenaciously each of these issues.

The Shell employees of Subclass B faced the serious potential of being dismissed on Shell's motion for summary judgment on intentional tort. Under Louisiana case law, virtually no intentional tort claims survive summary judgment except in rare instances of assault or battery. *See e.g., Bazley v. Tortorich,* 397 So.2d 475 (La.1981); *Fricke v. Owens–Corning Fiberglas Corp.,* 571 So.2d 130 (La.1990); *Mahfouz v. J.A.C.E. Oilfield Sales and Service, Inc.,* 569 So.2d 1074 (La. App. 3rd Cir.1990).

The claim for punitive damages in this case is governed by Louisiana Civil Code article 2315.3, which significantly limited the circumstances under which the claimants could recover punitive damages.[21] At least four motions for summary judgment on the issue of punitive damages were pending at the time of the settlement. The court's imminent decision of these dispositive motions was a key factor in bringing Shell and the PLC to the settlement table.

Assuming these issues could survive summary judgment, there still would be considerable risks inherent in proceeding to a full trial on the merits. It is not clear that the plaintiffs could prove punitive liability and obtain a punitive damage award in excess of Shell's $160 million settlement offer. The amount of punitive damages that could be awarded would have to bear a reasonable relation to the compensatory damage awards, *see Pacific Mutual Life Ins. Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), which would depend in large part on the strength of the causation evidence. Proving causation could be quite troublesome for some claimants. The evidence was nebulous for vast numbers of claimants plagued by generic symptoms such as headaches, eye and throat irritation, diarrhea, and sinus trouble. In addition, causation was an issue that Shell meticulously investigated for each claimant. Shell would not concede causation if the proof was lacking, as evidenced by Shell's vigorous defense of that issue in two groups of opt-out suits whose compensatory damages were tried to a jury before this court prior to the date of the settlement agreement.[22]

Thus, a trial to attempt to recover more than the sum negotiated in settlement, would be especially risky in light of the plaintiffs' problems with proving punitive damages and causation, and the enormous costs that would be expended in trying these issues. Even if the plaintiffs prevailed at trial and were awarded damages in excess of the amount of the settlement, lengthy appeals and expenses could be anticipated. Accordingly, the court finds that the litigation risks in the area of intentional tort, punitive damages, and causation, together with the cost of litigation, and the plaintiffs' potential for recovery, support the desirability of this settlement.

(5) *Range of Possible Recovery*

This factor requires the court to determine the value of the settlement in light of the potential for recovery. The PLC determined the settlement value by evaluating each individual claim. The initial step was to develop a computer database for each claimant. That process began in 1988 when the PLC developed a special computer program for this purpose and began to input information about known claimants. The first information the PLC obtained about the claimants came from attorneys privately retained by class members and from Shell, whose adjust-

---

**20.** Louisiana Civil Code article 2317 imposes strict liability on a defendant who has custody of a defective thing.

**21.** La.Civ.Code Ann. art. 2315.3 (West Supp. 1993) provides a remedy for punitive damages where "the plaintiff's injuries were caused by the defendant's wanton or reckless disregard for public safety in the storage, handling, or trans-

portation of hazardous substances or toxic substances." *See Galjour v. General American Tank Car Corp.,* 769 F.Supp. 953 (E.D.La.1991).

**22.** Punitive damages were not tried in these two cases because the court had consolidated the federal opt-out cases and the class claims for punitive damages for a single trial.

ers were working with class members to provide funds for repairs and medical needs. Next, the Notice of Claim forms, required by the court to be filed by the head of each household asserting a claim, provided the PLC with more concrete, yet still fundamental information about the claims. Later, during the Proof of Claim stage[23], the PLC obtained specific and detailed information about each claim, which they recorded in the computer data base.

Using a statistical computer program, certain patterns of damage emerged that were common to six particular geographic zones and correlated to the claimants' proximity to the refinery and the direction of the explosion blast. The PLC created a grid map of the five-parish area divided into these six zones and located each claimant on the map. The PLC used these zones of impact as the basis for uniformly allocating a "zone award" to each claimant in a particular zone for the emotional trauma of being physically present and experiencing the explosion.

A similar analysis was performed by counsel for Shell, and reviewed in confidence during the settlement negotiations by the Special Master. She reported there were marked similarities in the zone evaluations by the PLC and Shell.[24]

The PLC evaluation team also reviewed the personal injuries that were not covered by the zone award and developed an injury code system referred to as "the Bible". The Bible contains 963 different types of injuries grouped according to the part of the body injured, and reflecting the nature of the injury, duration, length of treatment, and the dollar value assigned to each injury. The evaluations were made in light of research on Louisiana law regarding awards made in other cases for similar items of damage, weighted by consideration for the possibility of recovery of punitive damages.

In addition, the PLC reviewed the Proof of Claim forms for damage items that were unique to each individual such as property damage, lost wages, and future loss of wages. As part of the Proof of Claim protocol, the claimants were required to produce supporting documentation for these items of damage and to produce information about insurance and prior receipt of any funds.

The PLC considered all of this information in determining each claimant's proposed allocation. In each instance the estimated award and documented damages were entered in their computer to determine the overall amount necessary to adequately compensate the claimants, known as the Claimants' Fund. To the aggregate of those totals, they added a 5% cushion for error, oversight, or other problems in allocation that might come to light later on.

After establishing the amount necessary for the Claimants' Fund, the PLC determined the additional amounts needed to pay the expense of the litigation, including fees and costs and the distribution expenses. Later, once apprised that the defendants required for settlement the establishment of an indemnity fund in their favor and resolution of the federal opt-out suits, the PLC factored these amounts into their settlement demand.[25] Thus, during settlement negotiations, the PLC knew a total figure for which they believed the case could reasonably be settled.

The opinion of the members of the PLC, several of whom have extensive experience in mass tort actions, is that $170,000,000 is a reasonable settlement. According to the

---

**23.** The 81–page Proof of Claim form was confected jointly by the PLC, Shell, and Brown & Root. It was designed as a substitute to written interrogatories and focused on identifying the nature and extent of the claimants' damages. The claimants met face-to-face with PLC staff members at one of three satellite PLC offices for review, completion, and execution of a Proof of Claim form before a notary and witnesses. Thereafter, the PLC forwarded each Proof of Claim form to the PLC central office in New Orleans, where each original form was date-stamped by the Special Master. Copies were then transmitted to Shell. (Brown & Root waived its right to receive copies.) After review and approval by a PLC member, each Proof of Claim form was entered into the PLC's computer database.

**24.** *See* Report of Special Master, p. 11 (Rec.Doc. 4055(g)).

**25.** The PLC estimated the settlement value of the federal opt-out suits using a similar analysis applied to the claimants.

PLC, that figure is weighted for the possibility of recovery of punitive damages. Their opinion is based on a fair and reasonable method of analysis. Defense counsel and the Special Master concur in that opinion.

Of course, the range of possible recovery by jury verdict could have been less or more than the settlement depending on the jury's perception of the evidence and the amount of expenses incurred in taking the case to trial. The determination of the range of possible recovery is not susceptible to mathematical precision. However, it is significant that there has been no evidence offered to show that the settlement value is inadequate in relation to the amount that a jury could have awarded. Under these circumstances, the court concludes that the amount of the settlement in comparison with the range of potential recovery by jury verdict supports the fairness, adequacy, and reasonableness of this settlement.

### (6) *Opinions of class counsel, class representatives, and absent class members*

The members of the PLC and the class representatives are in agreement that the proposed settlement is fair and equitable to the class. Counsel for Shell and Brown & Root concur.

Class members were given full opportunity to object to the terms of the proposed settlement in any and all respects. Out of 18,157 known claimants, a total of 1,346 filed timely objections, which amounts to 7.41% of the total known claimants. Of this number, 817 were objections from claimants whom the

PLC excluded from receiving any settlement funds on the basis of evidence that the class member failed to timely or properly file a Notice or Proof of Claim form [26], signed a release of claims [27], or was conceived, but "unborn" on the date of the explosion.[28] The remaining 528 objections were from claimants who were objecting to the adequacy of their individual allocation amount,[29] the assessment of fees and costs,[30] and the placement of minors' allocations in trust [31]. Despite having been notified to appear before the court for the commencement of the fairness hearing on September 21, 1993, only 205 claimants appeared for the roll call on that date. These claimants asserted a total of 236 objections.[32]

### a. Exclusion objections:

Any class member whose claim was excluded by the PLC in the allocation process was permitted to have a timely, written objection heard by the Special Master or the Magistrate Judge in advance of the fairness hearing. Each claimant who timely objected in writing was notified of a hearing date, and all who appeared to argue were permitted to do so.[33] The presiding Special Master or Magistrate Judge rendered written findings and recommendations from the bench for each objection. The report was immediately filed with the Deputy Clerk and a copy hand-delivered to the claimant, who was required to sign the original as evidence of receipt. If the claimant failed to attend the hearing, the clerk mailed the copy to the claimant's most current known address. Each report con-

---

26. There were 487 objections related to Notice and Proof of Claim problems.

27. There were 314 objections related to releases.

28. There were 16 objections related to the problem of the unborn claimants. The Special Master found that under Louisiana law the "unborn" claimants were physically present at the time of the explosion, and therefore entitled to a zone award, but that they were not entitled to any other compensation because there was no evidence of exposure to toxic substances or other compensable injury. None of these claimants appealed the Special Master's ruling, and the court adopted the recommendation.

29. There were 409 objections in this category.

30. There were 101 objections in this category— 60 relating to the claimant's private attorney's fee and cost assessment and 41 to the PLC's fee and cost assessment.

31. There were 18 objections in this category.

32. Of the 236 objections, 158 were appeals on exclusion rulings, 4 were objections to exclusions but had failed to file appeals, and 74 were objections to the assessment for fees and costs or the adequacy of an individual allocation.

33. Out of 817 exclusion objections, 61 were resolved prior to being heard by the Special Master and Magistrate Judge.

tained a notice of the time period for filing an appeal to the district judge.

There were a total of 293 appeals from the rulings of the Special Master or Magistrate Judge. At the commencement of the fairness hearing on September 21, 1993, 205 claimants answered the roll call. These claimants asserted 158 objections to exclusion. All exclusion objectors who appeared were permitted to orally argue their appeals, but not all of them remained to do so. The court heard oral argument on 139 exclusion appeals.

The court was bound by Fifth Circuit precedent to review the record on all objections before acting on the recommendation of the Special Master or Magistrate Judge, even as to those who did not appeal or appear for roll call.[34] Accordingly, the court painstakingly reviewed the record on 756 objections[35] to decide whether an excluded claimant was entitled to participate in the settlement.

The court made findings of fact where necessary, and either adopted or rejected the report of the presiding Special Master or Magistrate Judge as warranted by the record. Many of these claimants presented sympathetic circumstances. The court's concern, however, was to treat each claimant fairly and to maintain parity in the application of its orders. With 756 objections to review, this was a monumental task, but the court and the parties remained vigilant throughout the process. The court holds the opinion that its objectives were achieved.

By the conclusion of the fairness hearing, the court had ruled that 115 of the claimants who objected to exclusion could participate in the settlement; 632 were to remain excluded from participating in the settlement; and 70 had voluntarily withdrawn their objections. Each of these individual rulings appear in the record of this case, and are compiled at Record Document # 4084.

When the PLC issued notice of the class action settlement, there were 18,157 known claimants. After the notice, objection, and hearing process regarding claimants who were excluded from participating in the settlement because of releases or deficiencies with their claims, there remains a total of 16,802 claimants who will participate in the settlement. Of these 10,963 are represented and 5,839 are unrepresented.

b. Objections to individual allocations, fees and costs, and placement of minors funds in trust

There were 528 objections in this category. The majority of the objections, 409, were asserted by claimants who were challenging the adequacy of their individual allocation amounts. Many of these were resolved and withdrawn as a result of the pre-trial conferences held both before and during the fairness hearing. The funds for resolving these claims came from the reserve specially set aside for potential allocation adjustments.[36]

The pre-trial conferences were attended by the PLC, Shell, and Brown & Root, and monitored by the Special Master. According to the Report of the Special Master,[37] the pre-trial procedure resulted in some adjustments of allocations when an error was found, where additional clarification to existing documentation was provided, or where necessary to ensure parity under the circumstances. She stated that many objections were withdrawn upon mere explanation of the claimant's Proof of Claim and Statement of Distribution. If an adjustment was made to the satisfaction of the claimant, the claimant was required to sign a withdrawal of his or her objection.[38] In the Special Master's opinion the parties gave due consideration to

**34.** *See Livas v. Teledyne Movible Offshore, Inc.,* 607 F.2d 118 (5th Cir.1979).

**35.** 817 exclusions objections, less the 61 objections resolved prior to being heard by the Magistrate or Special Master.

**36.** Known as the "Client Reserve Non–Opt Out."

**37.** *See* Report of Special Master, p. 27 (Rec.Doc. 4055(g)).

**38.** Three claimants who voluntarily withdrew their objections subsequently attempted to renege on the withdrawal—Joan and Daniel Byrd, and Dale Guarino. After hearing argument from these claimants, the court found that they each had knowingly, voluntarily and in writing withdrawn their objections, and accordingly, upheld the withdrawals of their objections.

the concepts of parity, fairness, and reasonableness in the method of allocation and any adjustments. The court has reviewed all adjustments in allocation and finds no evidence to contradict the Special Master's conclusion.

The notice of settlement provided that objections in this category could be considered by the court only if the claimant filed a timely written objection and appeared at the roll call on September 21, 1993. Those who failed to meet these requirements were advised that they were deemed to have waived their objection. Stragglers who appeared after September 21 were similarly informed.

Thus, of the 528 objections in this category, only 74 claimants answered the roll call at the commencement of the fairness hearing on September 21, 1993. Through the pre-trial process, 68 of these objections were resolved and withdrawn, leaving only four objectors who argued to the court—two objected to the adequacy of individual allocations,[39] and two objected to the amount of the private attorney's fee and cost assessment.[40] Of the original 18,157 known claimants, this amounts to 22.03/1000 of one percent (.0002203%).

As discussed in detail above, the PLC designed the zone awards, the injury code manual, and the protocol for obtaining supporting documentation to the claims asserted in the Proof of Claim forms to ensure parity, adequacy, and fairness in setting individual proposed allocations and a recommended quantum for the Claimants' Fund. The court preliminarily approved the PLC's allocation method on July 30, 1993, subject to objections to be offered by claimants at the fairness hearing.

The PLC's original evaluation of the 18,157 individual claims was evidently satisfactory to 97.7% of the class. Only 409 claimants or 2.3% objected to their individual allocations. Of these, all but 2 objections were resolved through the pre-trial process, using a total of $5,991,338.51 from the contingency reserve,

which, considering the total Claimants' Fund, is a reallocation of only 3.8% of the Claimants' Fund. Thus, of the 18,157 known claimants, only 22.03/1000 of one percent appeared before the court at the fairness hearing to argue objections, and of these only two claimants contended that their allocations were inadequate.

Considering the testimony regarding the PLC's system of evaluation, the remarkably low number of objections, and the merits of those objections, the court is satisfied that the PLC's allocation method and the execution of that method achieved the goals of parity, fairness, and adequacy.

### c. Conclusion

The court has considered all of the timely objections.[41] A remarkably low number of claimants objected, and an infinitesimally small number presented their objections before the court. Significantly, no class representatives, named parties, counsel, or claimants offered any argument or evidence in opposition to the fairness of the class action settlement. For the reasons discussed, the court concludes that the objections do not constitute sufficient grounds for rejecting the proposed settlement.

### D. Conclusion

The court has assessed the proposed settlement by considering the requisite factors. All six factors discussed unequivocally support the fairness, reasonableness, and adequacy of the proposed settlement. Accordingly, the court approves the proposed settlement in the amount of $170,000,000, plus accrued interest, as set forth in the Preliminary Settlement Agreement and the exhibits attached to and made part of the Agreement. The PLC shall consummate the settlement and CADA shall distribute the final individual net amounts allocated according to the terms set forth in the Preliminary Settlement Agreement and Exhibits thereto.[42]

---

**39.** Yvonne Simpson on behalf of herself and her mother, Elnora Jones, who did not appear at the hearing because she had suffered from a stroke.

**40.** Norman Richard on behalf of himself and his deceased wife, Augustine Richard.

**41.** The court also received several written comments from claimants who complimented the settlement and the work of the PLC.

**42.** As described, during the course of the Fairness Hearing, certain allocation adjustments were agreed to by the parties, all of which is

## III.  FEES AND COSTS

Also, before the Court is the PLC's petition for attorney's fees and reimbursement of expenses, filed on August 23, 1993, in accordance with the Settlement Protocol.  At that time, the petition and its exhibits were made available in the Clerk's office for inspection by any class member or private attorney for any class member.  The notice of proposed class action settlement informed class members and counsel of the date on which the petition was to be filed, the right to inspect the exhibits, and the right to assert an objection to the petition, in writing by September 10, 1993.

The PLC seeks an aggregate award of $31,846,795.76 in attorneys' fees.  That amount is a combination of the fees in the Settlement Corpus attorney fee reserve totaling $31,397,462.37, and the fees held in the PLC Fee Account at the Whitney Bank in the total amount of $449,333.39.[43]  In addition, the PLC seeks an award of costs in the aggregate amount of $13,845,192.57, which is combination of the cost reserves in the Settlement Corpus totaling $13,723,335.13,[44] and the costs held in the PLC Cost Account at

reflected in the final Schedule of Allocations and Statements of Distribution of record herein.

43.  The fee fund at the Whitney Bank consists of fees assessed on individual class member's settlements occurring prior to the class settlement agreement.  Pursuant to court orders, there was a 10% fee assessment on any individual settlements of class members during the period September 26, 1988 through May 18, 1992.  On September 13, 1989, the court approved a 10% assessment on individual settlements of claimants who opted-out of the class but who had reserved the right to pursue punitive damages.  The rationale was based upon the consolidation of the federal opt-out plaintiffs' punitive damage claims with the class trial on punitive damages, so that the PLC's efforts to establish punitive liability inured to the benefit of these opt-out plaintiffs.  On May 18, 1992, the court raised the assessment for claimants without individual representation to 20% to reflect the increased work load of the PLC during the Proof of Claim period.  These assessments did not represent the amount of fees payable to the PLC, but only formed a fund of money from which fees could be paid.  It also should be noted that if a plaintiff had a private attorney, the assessment was against the private attorney's fee, and the private attorney had the right to dispute the assessment.

the Whitney Bank in the total amount of $121,857.44.

The PLC requests that the total sum of fees and expenses be awarded in the aggregate for all members of the PLC, which amount shall then be apportioned among the members according to their internal agreement.[45]

### A.  Attorneys' Fees

■  There are historically two methods for awarding attorneys fees—the lodestar method and the reasonable percentage method.  The lodestar method calculates attorneys' fees by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate, leaving the judge discretion to increase or decrease that lodestar using a multiplier or discount figure determined after analysis of various factors bearing on the reasonableness of the fee.  The other method is to calculate attorneys' fees according to a reasonable percentage of the total funds recovered.

The United States Court of Appeals of the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), adopted a 12–factor lodestar method of determining court-awarded attorney fees.[46]

44.  These reserves include:  (a) a reserve in the amount of $5,000,000.03 for class administrative costs;  and (b) a reserve for litigation costs in the amount of $8,723,335.11.

45.  An award of an aggregate fee has been approved by the Fifth Circuit.  In *Longden v. Sunderman*, 979 F.2d 1095 (5th Cir.1992), the court stated that "[t]he district court acted well within its discretion in awarding an aggregate sum to [class counsel] that was based upon their efforts, leaving apportionment of that sum up to [class counsel] themselves."  *Id.* at 1101.

46.  The 12 factors are:
(1) the time and labor required;
(2) the novelty and difficulty of the questions involved;
(3) the skill required to perform the legal service properly;
(4) the preclusion of other employment by the attorney due to the acceptance of the case;
(5) the customary fee;
(6) whether the fee is fixed or contingent;
(7) the time limitations imposed by the client or the circumstances;
(8) the amount involved and the results obtained;
(9) the experience, reputation, and ability of the attorneys;

More recently, in *Longden v. Sunderman*, 979 F.2d 1095 (5th Cir.1992), the Fifth Circuit recognized that the prevailing trend in other circuits in common fund cases has been to award fees based on a percentage method, but declined the opportunity to adopt that method. *Id.* at 1099 n. 9. Instead, the court confirmed the lodestar method as the proper method in this circuit. However, the court's dicta indicates that a district court may also calculate fees using a percentage method. *Id.* at 1100 n. 11. In *Longden*, the district court arrived at the same figure under each method. The Fifth Circuit did not specifically state what its position would be if, using both methods, a court arrived at significantly different figures, but it seems clear from the court's apparent unwillingness to adopt the percentage method that the lodestar calculation must be the controlling method.[47] Accordingly, the court will discuss each of the *Johnson* factors as they apply in this case.

### 1. Calculation of the lodestar

■ At the commencement of this litigation, the court ordered the PLC to maintain detailed, contemporaneous time and expense records and to file these records under seal with the court. When the settlement agreement was preliminarily approved by the Court in June, 1993, the court appointed a local attorney practicing in the New Orleans area[48] to review those records and calculate the total hours reported from May 8, 1988 through June 10, 1993. His report was offered in evidence at the fairness hearing without objection. According to this report, the records reflect a reported total of 262,-874.75 hours of work: 33,854.50 hours for members of the PLC,[49] 10,343.25 hours for two attorneys who acted as special counsel to the PLC,[50] 1,287.50 hours for partners of the PLC members, 6,413 hours for senior associates, 14,401.25 hours for junior associates, 8,718.25 hours for law clerks, 35,102.75 hours for paralegal supervisors, 97,158 hours for paralegals, 39,542 hours for legal assistants, 3,765 hours for secretaries, and 12,289.25 hours for clerks.[51]

The PLC has requested to recover as costs, all of the foregoing hours, except hours of the PLC members and the two attorneys who acted as special counsel to the PLC. The PLC supports this request with the uncontradicted testimony from two experts[52] that in a case such as this where virtually all of a lawyer's or staff member's time is devoted to a single complex litigation and lead counsel are charging a contingency fee in the range of 15 to 20%, it is customary to charge the time expended by these personnel as costs, rather than fees, at a reasonable market rate. This is an economical method for the class, because if the hours were charged as fees they would be subject to application of a multiplier. In accordance with this uncontradicted testimony, the court will consid-

---

(10) the "undesirability" of the case;
(11) the nature and the length of the professional relationship with the client;
(12) awards in similar cases.
*Johnson*, 488 F.2d at 717–719. These factors were reflected in the American Bar Association Code of Professional Responsibility, Disciplinary Rule 2–106(180), and are currently reflected in Model Rules of Professional Conduct Rule 1.5(a).

**47.** While this court accedes to the minority position of the Fifth Circuit, it should be noted that the United States Supreme Court has never formally adopted or authorized the lodestar approach in the context of a common fund fee award even though given the opportunity to do so in *Boeing Co. v. Van Gemert*, 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980).

**48.** Gunther Michaelis of Konrad, Earnest & Michaelis, Metairie, Louisiana.

**49.** John Cummings, III, Wendell Gauthier, Daniel Becnel, Calvin Fayard, Hugh Sibley, Stephen Murray, Thomas Kliebert, Joseph Bruno, and Deonne DuBarry. Mr. Bruno was appointed as a member of the PLC on September 11, 1989. Mr. Reed resigned from the PLC on November 9, 1992, after he was elected to a judgeship.

**50.** Frank Dudenhefer and David Robinson.

**51.** The report shows additional hours which the court is not including in the calculation of the lodestar. These are 56.75 hours of a former member of the PLC whom the court removed because of his ineffective representation and who was subsequently disbarred.

**52.** Professor John C. Coffee of Columbia University School of Law, a nationally recognized and published expert in the field of attorneys' fees, and Russ Hermann of Hermann, Hermann, Katz & Cotlar, a personal injury lawyer with mass tort experience who has practiced in the New Orleans area for 27 years.

er only 44,197.75 hours, comprised of 33,-854.50 hours of PLC member time, plus 10,-343.25 hours of time expended by special counsel, Frank Dudenhefer and David Robinson, in calculating the lodestar.

Each member of the PLC and the special counsel submitted uncontradicted testimony that the hours reported were expended for the benefit of the class, rather than individual clients, accurately reflect the hours expended, and are not excessive or duplicative. The testimony is corroborated by the detailed time records class counsel have submitted. There was no evidence offered in opposition to the hours submitted. The court's familiarity with the tremendous time requirements of this litigation, its review of the evidence submitted by the PLC and Mr. Michaelis, and its opinion of the excellent results achieved for the benefit of the class, satisfies the court that these hours were reasonably expended during the past five years of this litigation.

■ The hourly rates applied to the hours reasonably expended must reflect the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation. *Blum v. Stenson*, 465 U.S. 886, 895–96 n. 11, 104 S.Ct. 1541, 1547 n. 11, 79 L.Ed.2d 891 (1984).

The evidence is that the practice of all members of the PLC is to charge on a contingency basis. Two members testified that on the few occasions that they have charged by time, their rates range from $200 to $250 an hour. The court heard expert testimony on the subject of attorneys' fee awards from two attorneys who practice in New Orleans and each have 27 years of experience. John D. Wogan, who has a general litigation and business practice, testified that $225 an hour for a senior partner is a reasonable rate. Mr. Hermann, who practices personal injury law and has experience in mass tort litigation, testified that if the PLC were to charge the comparable community rates, that rate would be approximately $300 an hour. He also testified that the top billing rate in this community for lawyers with a similar caliber of skills is $350 to $400 an hour, and the bottom billing rate is about $200 an hour. In

his estimation $225 an hour for a senior partner is reasonable.

The court "may consider its own knowledge and expertise concerning reasonable and proper fees and may form an independent judgment with or without the aid of witnesses as to value." *Norman v. Housing Authority of City of Montgomery*, 836 F.2d 1292, 1303 (11th Cir.1988).

■ Because the fee award in this case will be made in the aggregate and apportioned among the members according to their internal agreement, the court will not fix an hourly rate for each member of the PLC. The court has determined a reasonable rate for the committee and special counsel based on the evidence of the prevailing market rates in the community. While some members of the PLC individually may be entitled to a higher rate and other members to less, the court concludes that a reasonable hourly rate for the committee and special counsel is $225 an hour. When multiplied by 43,540.75 hours, the lodestar in this case is $9,796,500.

### 2. Adjustments of the lodestar

#### a. Time and Labor Required

There can be no dispute that this was a case of monumental proportions requiring an uncommon amount of time and labor. The court need only cite to the record which reflects over 640 depositions, 187 hearings on hundreds of motions, innumerable conferences, a 247–page pre-trial order listing over 10,000 exhibits and 40 experts.

Of the many remarkable achievements of counsel was the identification of 18,157 known claimants and the documentation and evaluation of their discrete claims. The adequate performance of this work required the staffing and management of claims offices, training and direction of personnel, establishment and maintenance of computer-assisted programs, and employment of the latest technology on office and investigation equipment and procedures.

The motion practice was relentless in its demands on time and labor from the initial stages of organization, investigation and discovery, during the process of class certifica-

tion, notification, discovery and claims investigation, and through the formulation of a trial plan, appeal, and settlement. Counsel have accomplished an extraordinary amount of work in the last five years, resulting in a favorable settlement for the class. A tremendous number of hours, 262,874.75, were expended by attorneys and professional staff in this effort, but it should be emphasized that of these hours, 75% were performed by law clerks, paralegals, and general clerks in an effort to economize.

### b. Novelty and difficulty of the questions involved

At first glance, the legal liability issues in this case—negligence, causation, intentional tort, punitive damages—appear elementary and relatively unsophisticated. Upon closer scrutiny, the variety, novelty, and complexity of the questions presented are manifest.

For example, the technical aspects alone have been particularly challenging and complex. The factual evidence on liability issues required the PLC to retain experts to consult on subjects like refinery processes, chemical engineering, corrosion engineering, mechanical engineering, electrical engineering, explosion analysis, computer programming, supercomputers, and more.

There is much unchartered territory in the mass tort class action field, particularly in the area of procedure. Prime examples are the issues of whether to certify a class and how to try the compensatory and punitive damage claims of thousands of claimants. The court's trial plan, conceived in part by the PLC, is a matter of first impression in the country. Testimony at the fairness hearing revealed that counsel in several mass tort class actions pending across the United States are looking to various aspects of this case as a benchmark.

### c. Skill required to perform the legal service properly

The skill required to perform the work undertaken by the PLC in this case called for the services of counsel experienced in mass tort class actions. This is a sub-specialty in which few attorneys qualify. The prosecution of the case required counsel with the foresight to develop an expedient course of action, the ability to persevere in the face of daunting obstacles, and the resources necessary to pursue the case to conclusion. The size of this litigation demanded counsel with excellent organizational abilities. Handling the claims and inquiries of thousands of class members required excellent communication and interpersonal skills. Counsel also needed to be flexible to meet various exigencies that arose, particularly during the discovery stage when it was not uncommon to have multiple depositions proceed at the same time in different locations. The PLC's plan for documenting and evaluating thousands of discrete damage claims required a great deal of creativity, technical expertise, and exacting standards. In the opinion of the court, this case could not have reached the stage it is today with the commendable results achieved were it not for the collective talents of the members of the committee, special counsel, and defense counsel.

### d. Preclusion of other employment due to participation in the case

The members of the PLC and special counsel practice almost exclusively in personal injury law in small firms. They have all testified that their participation in this case has substantially curtailed, and in some cases foreclosed, their acceptance of other employment or business opportunities. This is confirmed by the volume of hours necessarily expended in this case. The loss of business opportunity has been harshly extracted on these attorneys. Lasting over five years, there is no doubt that this case has been an extraordinary emotional and financial drain on the attorneys.

### e. The customary fee

Personal injury attorneys have adjusted their practice to the vagaries of time and success through the use of a contingent fee system. This system permits a greater recovery for successful cases, thereby rewarding their investment in successes and offsetting the losses from unsuccessful cases. The customary contingency fee is between 33⅓% and 40%.

### f. Whether the fee is fixed or contingent

The committee undertook this case on a contingency fee basis. They have received

no funds from their work on this case in over five years, yet they assumed a heavy financial burden by underwriting the expense of this case. Even though Shell partially admitted strict liability, and it was virtually certain that the plaintiffs could eventually recover some funds, there was no certainty as to the amount that could be recovered or when the case could be resolved.

### g. The time limitations imposed by the client or the circumstances

From the date of the explosion, the parties litigated this case aggressively. There was no period of inactivity at any point in the five year history of this case. The defense was relentless and the plaintiffs were equally persevering. The record reflects that the management of this action by the PLC has required almost continuous attention to discovery, motion practice, and attendance at hearings and conferences often conducted on a few minutes notice. Counsel were often required to cancel or delay other important commitments in order to respond to the exigencies of this case. It is expected that counsel will maintain this same pace through the disbursement process.

### h. The amount involved and the results obtained

In this case, the common fund or Settlement Corpus is the measure of the results obtained for the class through the efforts of counsel. The PLC's efforts have created a cash settlement fund for the class in the amount of $170,000,000, plus interest. This Settlement Corpus is obviously an extraordinarily large sum of money and is adequate to fairly compensate the claimants. The efforts of plaintiffs' counsel conferred this benefit on the class in a short period of time when compared with the potential length of the case. Given the infinitesimally small number of objections that were argued to the court, it is apparent that the class members themselves are satisfied.

### i. The experience, reputation, and ability of the attorneys

The group of lawyers who participated in this suit are as skilled as any group of lawyers in the country. The plaintiffs were opposed by a formidable and unforgiving defense team. The skill of the opposition demanded class attorneys with the caliber of experience of the members of the PLC.[53] The court bases its opinion not only on the reputation of counsel but on observations of their competent representation during the five years of this litigation. Their combined experience and talent has greatly enhanced and facilitated the management of this litigation.

### j. The "undesirability" of the case

This case may be considered "undesirable" based on factors already discussed—the financial obligations and pressures, the time constraints, and the physical and emotional demands of a mass tort class action of this size and complexity. Of all these undesirables, the court finds that the time commitment required and the concomitant risks are the most undesirable aspects. When the time commitment is as high as it has been in this case, it can consume a significant portion of a lawyer's career. The result is that attorneys in small firms are unable to diversify their portfolios, and consequently, when the case is handled on a contingency basis, as this one was, there is a high degree of financial risk if the suit is not successful. In the beginning of this case, no one knew whether the claimants would number 5,000 or 100,000. No one could predict whether this case could be tried in a collective format or whether there would have to be thousands of individual determinations that would deprive the case of any real economic value. In light of these considerations, the risk counsel assumed was enormous.

### k. The nature and the length of the professional relationship with the client

Because this is a class action and the PLC members were appointed by the court, the

---

**53.** Several of these attorneys have played prominent roles in some of the best known mass tort cases of the last decade in Louisiana and across the United States. Examples include the MGM Grand Hotel Fire Litigation, San Juan DuPont Plaza Fire Litigation, the Hyatt Hotel Skywalk Litigation, the Pan Am crash in Kenner, Louisiana, the Delta crash in Dallas, Texas, the Livingston, Louisiana train derailment, the New Orleans Tank Car Fire Litigation, and the Continental Grain Elevator Explosion.

lawyers do not have the same relationship with the "client" as in the usual type of litigation. Nevertheless, the PLC frequently had face-to-face and telephone contact with the claimants, especially during the Notice and Proof of Claim process. Client communication was a particular challenge in this case. Many members of the class are illiterate. Counsel responded to innumerable inquires from class members who needed explanations, assistance, and assurances. The class members who lived closest to the refinery comprised a network of closely-knit relatives, neighbors, and friends. Unfortunately, an unfounded rumor was often the spark that ignited a barrage of telephone calls. These situations demanded good communication and interpersonal skills.

### 1. Awards in similar cases

The majority of the common fund fee awards are made according to a percentage, and fall between 20% to 30% of the fund.

This fee percentage would often be higher on a proportional basis for modest recoveries because of the larger ratio of hours to recovery amount that would likely be involved. On the other hand, the fee percentage would be significantly more modest as the common fund recovery begins to reach recoveries approaching or exceeding $100 million, based on the notion that the effort necessary to achieve recovery dollars at the high end was less onerous, on a sliding scale, than the effort expended for recovering the threshold sums by judgment or settlement.

*Newberg on Class Actions,* § 14.03, p. 14–14 (Dec.1992). There are presently no reported decisions involving mass tort cases comparable to this case in terms of the size of the award, the duration of the litigation, and the numerosity of the claimants in which the lodestar method was the basis for an award.[54] However, as a general rule, multiples ranging from one to four frequently are awarded in common fund cases when the lodestar method is applied.[55] *Id.* at 14–5.

### 3. Conclusion

A critical consideration in determining the reasonableness of any fee award should be whether the class members themselves believe the fee to be reasonable. Out of 18,157 known claimants, no one appearing at the final settlement hearing had any objection to the amount of attorney's fees and expenses sought by the PLC. It is significant to the court that every witness who testified at the final settlement hearing on attorneys' fees testified that the amount of the fees requested was reasonable.

Analysis of each of the *Johnson* factors supports an upward adjustment of the lodestar. In this case, the lodestar factors could support a multiplier of 3 or 3.5, which would result in an adjusted lodestar equivalent to or greater than the amount of the fee requested by the PLC.

A percentage analysis also supports the reasonableness of the fee sought by the PLC. The total aggregate award sought, $31,846,-795.76, is 17.92% of all funds received in settlement from the Settlement Corpus and previous individual settlements.[56] The por-

---

**54.** *In re Nineteen Appeals Arising Out of San Juan DuPont Plaza Hotel Fire,* 982 F.2d 603 (1st Cir. 1992), reversed the district court's lodestar award of $36,000,000 from a $220,000,000 fund, due to procedural defects.

**55.** Examples of cases where multipliers from one to four were used are: *In Corrugated Container Antitrust Litigation,* 1983 WL 1872 (S.D.Tex. 1983) (awarding multipliers up to 4.0); *Brewer v. Southern Union Co.,* 607 F.Supp. 1511 (D.Colo. 1984) (awarding multipliers from 2.0 to 4.0); *In re MGM Grand Hotel Fire Litigation,* 660 F.Supp. 522 (D.Nev.1987) (awarding multipliers from 1.0 to 2.95); *In re Beverly Hills Fire Litigation,* 639 F.Supp. 915 (E.D.Ky.1986) (awarding multipliers from 1.0 to 5.0); *Squillacote v. United States,* 626 F.Supp. 127 (E.D.Wis.1985) (awarding 3.0 multi-

plier); *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) (awarding a multiplier of 2.0); *In re Agent Orange Product Liability Litigation MDL No. 381,* 818 F.2d 145 (2nd Cir. 1987), *cert. denied* by *Pinkney v. Dow Chemical Co.,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988) (awarding a multiplier of 1.5 and 1.75 where court used national hourly rate to arrive at lodestar, "thus skew[ing] the normal lodestar analysis").

**56.** The aggregate total sought by the PLC is a combination of $31,397,462.37 from the Settlement Corpus attorney fee reserves, plus $449,-333.39 of fees derived from individual settlements occurring prior to the class settlement. The Settlement Corpus and the funds received in

tion of the award to be paid from the Settlement Corpus, $31,397,462.37, is 18.18% of the Settlement Corpus, inclusive of interest. According to the expert testimony, these percentages are well within the range of a reasonable percentage fee in a mass tort class action of this nature.

Under these circumstances, the court can discern no reason to reduce the award sought by the PLC. The fee requested is clearly reasonable and justifiable under the lodestar analysis, no one appearing at the settlement hearing opposed the fee, and it is supported by a percentage analysis. Accordingly, the court will apply a multiplier of 3.2508.

## B. Costs

■■■ The PLC seeks an award of $13,845,192.57 as costs. This total includes $10,086,686.88 for hours expended by all of the personnel who worked on the litigation, exclusive of the members of the PLC and the two special counsel, Dudenhefer and Robinson. The hourly rates applied to these hours are well-supported by uncontradicted evidence submitted at the fairness hearing.

The total cost application represents all known costs as of June 10, 1993, as evidenced by contemporaneous records which were submitted to the court quarterly, and the evidence submitted at the fairness hearing. The documentation supporting these costs were reviewed and the totals calculated by the court expert, Gunther Michaelis. In addition, another court expert, Holly Sharp, performed a cash profile of the two PLC bank accounts used to pay costs of the litigation. The court has reviewed the reports of both experts and the other evidence submitted at the fairness regarding the cost application. No one offered any evidence at the fairness hearing in opposition to the cost application. Accordingly, the court finds that the request for an award of costs in the amount of $13,845,192.57 is reasonable and supported by the evidence.

## IV. CONCLUSION

As of the date of this opinion, the PLC has made all allocation adjustments pursuant to the orders of the court entered during the fairness hearing. After deducting the awards for fees and costs, there remains available in the Claimants' Fund $123,311,783.77 for distribution to the claimants. These amounts shall be distributed in accordance with the Preliminary Settlement Agreement and the final Statements of Distribution appearing in the court record at Record Document # 4083.

Accordingly,

IT IS ORDERED That:

1. Having determined that the proposed settlement is fair, reasonable, and adequate, the Preliminary Settlement Agreement which is fully set forth in the memorandum of Preliminary Settlement Agreement as Record Documents 2594, and was given contingent approval by the court on June 9, 1993, is hereby finally APPROVED under Federal Rule of Civil Procedure 23 on of all claims among the plaintiff class members, Shell, and Brown & Root, as fair, adequate, and reasonable.

2. Except as modified in paragraph three (3) below, the proposed Statement of Distribution from the Claimants Fund, prepared by the Court–Appointed Disbursing Agent (CADA) and filed by the PLC, Record Document 4083, is APPROVED, and upon this judgment becoming final and executory the net amount allocated to each claimant reflected therein is to be disbursed in the distribution process in accordance with further orders of the Court.

3. For the reasons stated in the Memorandum Opinion all objections to the proposed settlement of this class action, filed in this proceeding in accordance with the Notice of Fairness Hearing, are overruled except those objections to denial of claims or to individual allocations from the Claimants Fund which were sustained in the course of the fairness hearing, as set forth in the various orders entered during the course of the fairness hearing, and which have resulted in certain adjustments approved by the parties

settlement of individual class member's claims prior to the class settlement, total $177,713,840.77, inclusive of interest.

and reflected in the final Schedule of Allocations and Statement of Distribution from the Claimants Fund.

4. The Reserve for Litigation Costs and Expenses is fixed in the sum of $7,884,137.73, which is an amount equal to five (5%) percent of the gross allocations to claimants from the Claimants Fund and two and one-half (2½%) percent of the gross recovery by each non-class member whose claim was settled as a part of the Preliminary Settlement Agreement.

5. The Court hereby approves the following reserves from the Settlement Corpus from which disbursements will be made by the Court–Appointed Disbursing Agent (CADA), as approved and ordered by the Court in the disbursement process in accordance with the Settlement Plan:

(A) Claimants Fund, gross allocations to class members represented by private counsel as of June 9, 1993; (B) Claimants Fund, gross allocations to claimants not represented by private counsel as of June 9, 1993; (C) Reserve for Litigation Costs and Expenses; (D) Reserve for Settlement of Non–Class Claims; (E) Reserve for indemnity Claims; (F) Reserve for Class Administrative Expenses; (G) Reserve for Distribution Costs and Taxes; each of which Reserves are fixed and funded in the amounts more fully set forth in the Memorandum of Reasons and Findings.

6. The petition of the Plaintiffs' Legal Committee for an aggregate attorney fee, applicable to all services rendered or to be rendered to the Class herein, is GRANTED, fixed and awarded in the total sum of $31,846,795.76 which includes $449,333.39 withheld from previous settlements and $31,397,462.37, plus one-third (⅓) of any interest accruing on the Settlement Corpus after December 15, 1993, to be assessed against and paid from the following reserves:

(A) Ten (10%) percent of:

(1) The gross allocations from the Claimants Fund to each class member represented by private counsel as of June 9, 1993, to be deducted and paid from private counsel's fee.

(2) The Reserve for Settlement of Non–Class Claims.

(B) Thirty-three and one-third (33⅓%) percent of:

(1) The gross allocations from the Claimants Fund to each class member unrepresented by private counsel as of June 9, 1993.

(2) The Reserve for Class Administrative Costs and Expenses.

(3) The Reserves for Indemnity and Liability Claims.

(4) The Reserve for Distribution Costs and Taxes.

7. Out of the aggregate attorney fee fixed and awarded hereinabove the sum of $3,000,000.00 is allocated to costs and fees to be incurred in the distribution and administration process, to be paid by CADA to PLC members for costs and services in the completion of the distribution phase.

8. For purposes of the foregoing, the Plaintiffs' Legal Committee consists of:

John J. Cummings, III, Liaison Counsel

Daniel E. Becnel, Jr.

Calvin C. Fayard, Jr.

Wendell H. Gauthier, Jr.

Thomas Kliebert, Jr.

Stephen B. Murray

W. Hugh Sibley

Joseph M. Bruno

Deonne DuBarry

Frank C. Dudenhefer, Jr., Of Counsel

David W. Robinson, Of Counsel

9. Any unresolved disputes by or among members of the Plaintiffs' Legal Committee or former members of the Plaintiffs' Legal Committee or other attorneys now or formerly associated with the Plaintiffs' Legal Committee, as to apportionment of or payment from the aggregate fee herein awarded to the Plaintiffs' Legal Committee, shall be submitted to and determined by the Court in the distribution phase of this action as provided hereinbelow, and shall not affect the finality of the Judgment approving the proposed settlement.

10. The petition of the Plaintiffs' Legal Committee for reimbursement of costs and

expenses which have accrued prior to June 10, 1993, in the sum of $13,845,192.57 is granted, fixed and awarded, to be paid from the costs withheld from previous settlements and the Reserve for Litigation Costs and Expenses, the Reserve for Class Administrative Costs and Expenses, the Brown & Root Contingency Reserve, and any amount remaining in the Reserve for Settlement of Non–Class Claims.

11. Any additional costs and expenses incurred by the Plaintiffs' Legal Committee subsequent to June 10, 1993, through completion of the distribution process, are to be paid from the Reserve for Distribution Costs and Taxes, and any balance remaining in the Reserve for Settlement of Non–Class Claims subject to prior approval of the Court.

12. Any and all distributions from the Claimants Fund to persons incapacitated under Louisiana law to act for themselves, including minors, interdicts, successions or absentees, are to be preserved for the benefit of such incapacitated purposes in bank accounts to be established and maintained pursuant to orders of this Court in the course of the distribution process.

13. Subject to all awards, modifications and conditions set forth hereinabove, the Court finds that the proposed distribution of the Settlement Corpus is fair, reasonable and equitable to the Class, comports with all requirements of Due Process of Law and with all requirements of Rule 23 of the Federal Rules of Procedure, and, accordingly, approves the proposed settlement in accordance with Rule 23(e) of the Federal Rules of Civil Procedure.

14. Shell Oil Company and Brown & Root USA, Inc., having tendered the sum of $170,000,000 in a Qualified Settlement Fund for the benefit of the Class, subject to approval of the proposed settlement, are hereby relieved of any further liability to the Class for any and all damages resulting from the explosion of May 5, 1988, at the Shell Oil Company Manufacturing Complex located in the Parish of St. Charles, Louisiana, and, accordingly, shall be dismissed with prejudice from this proceeding upon Judgment becoming final and executory, the dismissal and Satisfaction of Judgment to be in accordance with all provisions and conditions of the Preliminary Settlement Agreement and the exhibits attached thereto and made part thereof.

15. The Clerk of this Court shall enter Judgment and mail a copy with notice thereof to counsel for all claimants who are represented by private counsel and to all claimants who are not represented by private counsel together with each claimant's Statement of Distribution, the form of both the Notice of Judgment and Statement of Distribution having been approved by order this day entered.

16. The Court shall retain jurisdiction over this action for purposes of the completion of the distribution process and any other matters necessary to enforce the terms and conditions of the settlement as approved herein.

17. The Court's retention of jurisdiction over the distribution process is for the purpose of effectuating, enforcing and implementing the Judgment and shall not affect the finality of the Judgment approving the proposed settlement.

## JUDGMENT

For the reasons assigned in the Memorandum Opinion filed on October 19, 1993, and in accordance with the orders contained therein, it is ORDERED AND ADJUDGED that:

1. The Preliminary Settlement Agreement, which is fully set forth in the Memorandum of Preliminary Settlement Agreement as Record Document 2594, and including all exhibits made part thereof, which were given contingent approval by the Court on June 9, 1993, are hereby finally APPROVED under Rule 23 of the Federal Rules of Civil Procedure as this Court finds the proposed settlement and all its terms, conditions and requirements to be fair, reasonable and adequate.

2. Except as modified in paragraph three (3) below, the proposed Statement of Distribution from the Claimants Fund, prepared by the Court–Appointed Disbursing Agent (CADA) and filed by the PLC, Record Document 4083, is APPROVED, and upon this judgment becoming final and executory the

net amount allocated to each claimant reflected therein is to be disbursed in the distribution process in accordance with further orders of the Court.

3. For the reasons stated in the Memorandum Opinion all objections to the proposed settlement of this class action, filed in this proceeding in accordance with the Notice of Fairness Hearing, are overruled except those objections to denial of claims or to individual allocations from the Claimants Fund which were sustained in the course of the fairness hearing, as set forth in the various orders entered during the course of the fairness hearing, and which have resulted in certain adjustments approved by the parties and reflected in the final Schedule of Allocations and Statement of Distribution from the Claimants Fund.

4. The Reserve for Litigation Costs and Expenses is fixed in the sum of $7,884,137.73, which is an amount equal to five (5%) percent of the gross allocations to claimants from the Claimants Fund and two and one-half (2½%) percent of the gross recovery by each non-class member whose claim was settled as a part of the Preliminary Settlement Agreement.

5. The Court hereby approves the following reserves from the Settlement Corpus from which disbursements will be made by the Court–Appointed Disbursing Agent (CADA), as approved and ordered by the Court in the disbursement process in accordance with the Settlement Plan:

(A) Claimants Fund, gross allocations to class members represented by private counsel as of June 9, 1993; (B) Claimants Fund, gross allocations to claimants not represented by private counsel as of June 9, 1993; (C) Reserve for Litigation Costs and Expenses; (D) Reserve for Settlement of Non–Class Claims; (E) Reserve for Indemnity Claims; (F) Reserve for Class Administrative Expenses; (G) Reserve for Distribution Costs and Taxes; each of which Reserves are fixed and funded in the amounts more fully set forth in the Memorandum of Reasons and Findings.

6. The petition of the Plaintiffs' Legal Committee for an aggregate attorney fee, applicable to all services rendered or to be rendered to the Class herein, is granted, fixed and awarded in the total sum of $31,846,795.76 which includes $449,333.39 withheld from previous settlements and $31,397,462.37, plus one-third (⅓) of any interest accruing on the Settlement Corpus after December 15, 1993, to be assessed against and paid from the following reserves:

(A) Ten (10%) percent of:

(1) The gross allocations from the Claimants Fund to each class member represented by private counsel as of June 9, 1993, to be deducted and paid from private counsel's fee.

(2) The Reserve for Settlement of Non–Class Claims.

(B) Thirty-three and one-third (33⅓%) percent of:

(1) The gross allocations from the Claimants Fund to each class member unrepresented by private counsel as of June 9, 1993.

(2) The Reserve for Class Administrative Costs and Expenses.

(3) The Reserves for Indemnity and Liability Claims.

(4) The Reserve for Distribution Costs and Taxes.

7. Out of the aggregate attorney fee fixed and awarded hereinabove the sum of $3,000,000.00 is allocated to costs and fees to be incurred in the distribution and administration process, to be paid by CADA to PLC members for costs and services in the completion of the distribution phase.

8. For purposes of the foregoing, the Plaintiffs' Legal Committee consists of:

John J. Cummings, III, Liaison Counsel

Daniel E. Becnel, Jr.

Calvin C. Fayard, Jr.

Wendell H. Gauthier, Jr.

Thomas Kliebert, Jr.

Stephen B. Murray

W. Hugh Sibley

Joseph M. Bruno

Deonne DuBarry

Frank C. Dudenhefer, Jr., Of Counsel

David W. Robinson, Of Counsel

9. Any unresolved disputes by or among members of the Plaintiffs' Legal Committee or former members of the Plaintiffs' Legal Committee or other attorneys now or formerly associated with the Plaintiffs' Legal Committee, as to apportionment of or payment from the aggregate fee herein awarded to the Plaintiffs' Legal Committee, shall be submitted to and determined by the Court in the distribution phase of this action as provided hereinbelow, and shall not affect the finality of this Judgment approving the proposed settlement.

10. The petition of the Plaintiffs' Legal Committee for reimbursement of costs and expenses which have accrued prior to June 10, 1993, in the sum of $13,845,192.57 is granted, fixed and awarded, to be paid from the costs withheld from previous settlements and the Reserve for Litigation Costs and Expenses, the Reserve for Class Administrative Costs and Expenses, the Brown & Root Contingency Reserve, and any amount remaining in the Reserve for Settlement of Non–Class Claims.

11. Any additional costs and expenses incurred by the Plaintiffs' Legal Committee subsequent to June 10, 1993, through completion of the distribution process, are to be paid from the Reserve for Distribution Costs and Taxes, and any balance remaining in the Reserve for Settlement of Non–Class Claims subject to prior approval of the Court.

12. Any and all distributions from the Claimants Fund to persons incapacitated under Louisiana law to act for themselves, including minors, interdicts, successions or absentees, are to be preserved for the benefit of such incapacitated purposes in bank accounts to be established and maintained pursuant to orders of this Court in the course of the distribution process.

13. Subject to all awards, modifications and conditions set forth hereinabove, the Court finds that the proposed distribution of the Settlement Corpus is fair, reasonable and equitable to the Class, comports with all requirements of Due Process of Law and with all requirements of Rule 23 of the Federal Rules of Procedure, and, accordingly, approves the proposed settlement in accordance with Rule 23(e) of the Federal Rules of Civil Procedure.

14. Shell Oil Company and Brown & Root USA, Inc., having tendered the sum of $170,000,000 in a Qualified Settlement Fund for the benefit of the Class, subject to approval of the proposed settlement, are hereby relieved of any further liability to the Class for any and all damages resulting from the explosion of May 5, 1988, at the Shell Oil Company Manufacturing Complex located in the Parish of St. Charles, Louisiana, and, accordingly, shall be dismissed with prejudice from this proceeding upon this Judgment becoming final and executory, the dismissal and Satisfaction of Judgment to be in accordance with all provisions and conditions of the Preliminary Settlement Agreement and the exhibits attached thereto and made part thereof.

15. The Clerk of this Court shall enter this Judgment and mail a copy with notice thereof to counsel for all claimants who are represented by private counsel and to all claimants who are not represented by private counsel together with each claimant's Statement of Distribution, the form of both the Notice of Judgment and Statement of Distribution having been approved by order this day entered.

16. The Court shall retain jurisdiction over this action for purposes of the completion of the distribution process and any other matters necessary to enforce the terms and conditions of the settlement as approved herein.

17. The Court's retention of jurisdiction over the distribution process is for the purpose of effectuating, enforcing and implementing its Judgment herein and shall not affect the finality of this Judgment approving the proposed settlement.

## APPENDIX

### RESERVES (1)

| | | NET | FEES | COST |
|---|---|---|---|---|
| $407,500.00 | B & R CONTINGENCY RESERVE (2) | $0.00 | $0.00 | $407,500.00 |
| $108,469,606.38 | REPRESENTED CLAIMANTS | $92,199,165.42 | $10,846,960.64 | $5,423,480.32 |
| $46,964,342.26 | UNREPRESENTED CLAIMANTS | $28,961,344.55 | $15,654,780.60 | $2,348,217.11 |
| $7,500,000.00 | CLASS ACTION COST | $5,000,000.03 | $2,499,999.98 | $0.00 |
| $1,500,000.00 | LIABILITY RESERVE | $1,000,000.01 | $500,000.00 | $0.00 |
| $1,839,210.31 | CLIENT RESERVE NON OPT-OUT | $1,434,481.43 | $312,768.37 | $91,960.52 |
| $1,575,000.00 | INDEMNIFICATION RESERVE | $1,050,000.01 | $524,999.99 | $0.00 |
| $2,928,101.05 | DISTRIBUTION COST & TAXES | $2,201,178.72 | $976,033.67 | $0.00 |
| $819,191.28 | CLIENT RESERVE OPT-OUT USED (3) | $716,792.37 | $81,919.13 | $20,479.78 |
| $680,808.72 | REMAINING OPT-OUT RESERVE (2,3) | $0.00 | $0.00 | $431,697.38 |
| $172,683,760.00 | TOTAL PRINCIPAL & INTEREST | $132,562,962.52 | $31,397,462.37 | $8,723,335.11 |

Net Class Action Cost ---------->

| | NET | FEES | COST |
|---|---|---|---|
| Fees and Costs From Previously Settled Claimants | $485,783.39 | | $5,000,000.03 |
| To Resolve Fee & Cost Disputes on Previously Settled Claimants | (36,450.00) | $449,333.39 | $121,857.44 |
| GRAND TOTAL FEES AND COSTS | | $31,846,795.76 | $13,845,192.57 |

**Percentages Used**

| | |
|---|---|
| 2.50% | OPT OUT COST |
| 5.00% | OTHER COST |
| 10.00% | REP. FEES |
| 33.33% | UNREP. FEES |
| 33.33% | RES FEES |
| 17.01% | AVG. |

| TOTALS | | RATE | MONTHS |
|---|---|---|---|
| $2,583,760.00 | SHELL INTEREST | 3.23% | 6 |
| $100,000.00 | B & R INTEREST | 3.00% | 4 |

| | | |
|---|---|---|
| $160,000,000.00 | TOTAL PRINCIPAL | SHELL |
| $10,000,000.00 | TOTAL PRINCIPAL B & R | |
| $172,683,760.00 | See Note (4) | |

| | |
|---|---|
| $123,311,783.77 | NET TO CLAIMANTS |
| $31,397,462.37 | ATTORNEY FEES FROM CLASS ACTION |
| $17,974,513.86 | OTHER NON CLAIMANT RESERVES |
| $172,683,760.00 | |

### NOTES

(1) These are the reserves as of the date of this opinion with interest calculated through December 15, 1993. Minimal adjustments to the reserves may be necessary to reflect additional interest or to correct any clerical errors. The Court retains *jurisdiction of the reserves for this purpose.* No disbursements may be made without court order.

(2) Due to costs overages, the PLC waived its fee on this amount, and the Court granted the PLC's request to transfer this amount to the PLC cost reserve with the remaining amount going to the Distribution Cost & Tax Reserve.

(3) The term "Opt out" is defined as the Federal opt-out cases pending on June 9, 1993, the date of the Preliminary Settlement Agreement.

(4) Interest is calculated through December 15, 1993.